Next case on today's docket is a case of people in the state of Illinois versus Douglas Totty. And we have Rebecca McCormick for the appellant. And we have Donna Polinsky for the appellant. And you may proceed, Ms. McCormick, when you're ready. Your Honors, counsel, this state appeal is before this panel for the second time. We were just aware of that. We were just discussing that we were aware of that. And it was remanded for the court below to make findings about whether the statements the defendant made were voluntary. The court on remand entered this order, that the previous order and findings therein filed 7 December 2009 is reaffirmed and restated as incorporated in the hearing. And in that prior order, the court basically found that the officers were credible and that they had done nothing improper, you know, except for failing to give Moran up. Further, the court finds at the time of questioning the defendant by the police, the defendant's statements were not voluntarily made, were given under improperly coercive circumstances, and the contact infringed upon the defendant's right of self-incrimination. This order finding that the statements were involuntary because of improper coercive circumstances is erroneous as a matter of law. And when you look at whether, I mean, okay, there are two statements and one consent. So there are only two statements that we're dealing with. The first statement is in answer to the question of did you buy Sudafed and an admission, yes. Where is it? And it was located, and the defendant indicates it's located inside of his trailer in a kitchen cabinet. Well, didn't he call it a medicine cabinet in the ñ not a kitchen cabinet, even though it was. Yes, at one point it's referred to as a medicine cabinet, but it is in a kitchen cabinet. And was there anything other than allegedly medicine in the cabinet? Well, the officer did see some other things. Like what? Hydrogen peroxide. Alcohol and hydrogen peroxide. Which you'd usually find in a medicine cabinet. Yes, exactly, exactly. Now, ordinarily, if you ñ for instance, if an officer stopped me and said, did you buy Sudafed from Walmart, and I had, and I said yes, that wouldn't be incriminating because you can legally buy Sudafed from Walmart. You can, and saying yes I did doesn't lead to ñ Well, what if you bought Sudafed, hydrogen peroxide, and rubbing alcohol at Walmart and put it in your medicine cabinet or your kitchen cabinet? What does that tell you? But that wasn't the question. Okay. It was only ñ the question only ñ and, yes, my point is, ordinarily we're talking about legal, permissible activity. I can go buy Sudafed from Walmart. I can possess Sudafed. One pack, one box. Sure, yeah, yeah, and that's what was sold, one pack. And so, you know, ordinarily this kind of question, did you buy Sudafed from Walmart, doesn't really ask for an incriminating answer because what we're talking about ordinarily for a person innocent of any crime, that doesn't call for an incriminating answer. What makes it look like it calls for an incriminating answer is the fact that the officers know that this man has a history of buying lots of quantities of ñ Well, now, I thought the only evidence they had was that a week before he bought a box from Walmart. Right, yeah. And how many are in a box? Is that about a week's supply if you had a cold? No, I think it's more like ñ it depends. You can buy it in different quantities, and I don't know what quantity he had. You can buy, I think, what should be a month's supply, or you can buy something shorter of that. Okay. So, but, you know. Do we know here in this case? I do not know. Okay. It's a box, referred to as a box of Sudopet. So ordinarily that wouldn't call, you know, for a person innocent of any crime, that wouldn't call for an incriminating answer. But what the officers knew about him and ñ What did they testify that they knew about him? They testified that, Agent Fisher testified he was familiar with the defendant, that he had a history of meth convictions, I believe, and that he knew about his history of buying Sudopet. So, you know, the officer ñ Was he more specific than that? That he had one conviction or two convictions or three? Or none? I don't know. It says that he was familiar with the defendant and he'd been to the defendant's residence before with regard to methamphetamine investigation and was aware of the defendant's background, including a prior methamphetamine conviction. Those are the things he knew. So ordinarily the questions that he was asked, did you buy the Sudopet, where is the Sudopet, wouldn't call for an incriminating answer. But in context, it does. In context, the officer asking him without giving him Miranda warnings first. It would fall under, in this circumstance, fall under a question that asks for an incriminating answer. That's my point. And where is it that also could call for an incriminating answer, given these circumstances. But asking for consent to search is non-testimonial and you don't have to give Miranda warnings before you ask for consent to search. So arguably two statements fell under the scope of Miranda and Miranda should have been given and the answer to those two statements would be in violation of Miranda, but not the answer to the question, can I search for it, can I go get it. That is not testimonial. So actually there are only two statements and those statements given the totality of the circumstances were given voluntarily. You have to look at the totality of the circumstances and look at it in the light of the court's finding, factual findings and findings about credibility. The court gave credibility to the officers who testified. And here are the circumstances. The defendant was 59 at the time he was arrested. Unabhorrent, he is legally arrested, he is handcuffed. The officers and the defendant had prior experience with law enforcement. There's no sign in the record that he was of low intelligence or lacked education. He testified rationally at the suppression hearing. The hour wasn't late at night. It was 4 p.m. The officers did not go up. They didn't even go up and knock on the defendant's residence. They asked their brother, the defendant's brother who was outside, would you go get him. So the brother opened the door and yelled at him to come out because the police are here. So they don't even go up to the residence. The defendant is arrested on the warrant for failure to appear, and he is handcuffed. And the two questions, only two questions are asked. And what was that warrant for? What was the warrant he was arrested for? They had an outstanding warrant? Yes, it was for failure to appear. That's right. So he's in the driveway, he's arrested on a warrant, and there's no evidence of any coercion. They ask him two questions. Did you buy the suit of thread? Where is it? Those are the two questions. So there's no long harangue. There's no evidence of any coercion. There are only two officers present. And the defendant obviously gives limited consent. He says, you can go in, my brother can go with you, and you can only, he limited the search to the medicine cabinet or the cabinet that's in the kitchen, to that one spot, only to get the suit of thread. And there is no general consent. He knew he could give a limited consent. So looking at the totality of the circumstances, there's no basis for finding that these statements were not voluntary. The court below has basically, as far as I can tell, concluded that the mere failure to give Miranda is the equivalent of not voluntary statement. Well, it's not voluntary in the sense that you can't use it against them in a court of law, but it was voluntary in the sense of it wasn't coerced. And that's what this court is looking at. Did anything that the officers learned from the defendant, was it the basis of any involuntary statement that let them learn the location of the suit of thread that the defendant had bought? And there simply is no basis for finding that his statements to the police were involuntary, because looking at the totality of the circumstances, the only thing that weighs against it is the fact that he was handcuffed. But that in itself, that one factor alone, is not sufficient to find out that, to find that his statements, the two statements were involuntary. And so for that reason, this court should reverse the court below, find that the statements were voluntary, and that the consent to search was also voluntary, given the totality of the circumstances. Yes? He did not change his mind after he said you can search and then? No. I got confused with another case maybe. No. And said, he never said. No, you're exactly right. There was that limited consent to search. But he never said you can't go in after he changed his mind. Didn't he initially say you can't go in? No. No. Not with the limited consent. There were two times they asked for consent to search. The limited consent was simply to go in. No, I'm talking about initially. Didn't he say I don't want you to go in? No. Okay. No. When they asked for a generalized consent to search, see, you know, and that's my point, ordinarily just possessing to the fact isn't incriminating. And so the defendant wasn't really making an incriminating statement when he said, yeah, I bought it, and, yes, it's in my cabinet. And then he limited his search to just the cabinet. And there's no testimony that the officer exceeded the limited consent He went straight in, accompanied by the defendant's brother, went straight into that cabinet, opened the cabinet, got the pseudofed, saw the alcohol and the peroxide, and went, oh, you put these three together and we have precursors, okay? But he was there at a point where he had a legal consent and right to be, and he saw that in plain view. He didn't touch him. He didn't seize him. He left him in the cabinet. Then they came out with the pseudofed, and at that point they asked, can we do a generalized search? And that's when he said no. That's when he said no, yes. So then they got a search warrant. And then they got a search warrant. And then what did they find? They found multiple items of, yes. But, you know, the point is that the officer stayed strictly within the limited consent to search. He only went straight in, and there's no testimony that he did anything otherwise. He went straight in, accompanied by the defendant's brother, opened the cabinet, got the pseudofed, saw the alcohol and the peroxide, and came out. And, see, up until that point, And this is another thing that really argues for the consent being voluntary and for the statements being voluntary, is that ordinarily without anything more, admitting that you bought pseudofed and that it's in your cabinet isn't incriminating. And he doesn't give the police the authority to look for anything else that might go with it that might be incriminating. I thought there was a dispute. I'm going back to something that I don't see here, but I thought I read previously, is that there was a dispute whether or not there was even a limited consent given. That it was that he said, no, I don't want anybody to go in, and then the police said something, their defendant's statement, the police said something like, I'm going in anyway, and he said, well, if you're going to go in, then I want Donald to go with you. Yeah. Okay. You're correct. Okay. Isn't that what they're arguing? The court found that the officers did nothing improper, that they were professional and they acted professionally and that there was no artifice and no reason. They can still find that and also legally find that they didn't have permission, can't they? I'm sorry? Can't they find that there wasn't any artifice or any undue intent on behalf of the officers and still find that they didn't have permission? In rebuttal, our officer, Fisher, testified that if he had not had limited consent to enter the residence, he never would have gone in, and the court found that the officer did nothing improper. I mean, the order could have been fleshed out a little more, but the court below credited the officer's testimony, and for that reason that's why I'm arguing only the facts that the court credited. See, I thought one of the facts of the case was they grabbed the keys from him because he locked the door when he came out, and he grabbed the keys and says, well, we're going in anyhow, we've got permission now. That is not in this case? Yes, it is. That was not believed by the trial court? This is the defendant's testimony. Right. And at that point when he said they grabbed the keys, that limited search has already occurred. Oh, it's after that? It's after that, yeah. Oh, I got confused. And the grabbing of the keys, even if you credit it, it was after the limited search, after the trailer had been secured, and may have even been, I can't really tell. Now I'm really confused. Yeah. Was that before the search warrant was issued? That's unclear. It was after the limited search. While there, either after, okay, it's after the limited search. Okay. That much I can say. Then it may have been while they're obtaining the search warrant. See, after the limited search. Okay, they said they grabbed the keys and were going in anyhow. No. No? No. I thought that's what he said. Well, no. He said they did. He said they grabbed the keys and said, I've got permission. Right, now I've got permission. And from that. And then they didn't do anything? Well. Assuming the trial just didn't believe it. You know, you can go either way, and it doesn't spell a problem for the state's case. And let me explain. There's the limited search. I got that. And then they asked for general consent to search. Said no. And then that's refused. And at that point they say they're going to get a search warrant. They secure the residence. Right. Okay. And that's okay. That's perfectly permissible. And then when did the man, if you credit the defendant's testimony, when did the officer take the keys? Well, it's either while the search warrant is pending or after the search warrant has been obtained. In any event, the taking of the keys does not have anything to do with whether his consent to the limited search is voluntary. But he was still there when the search warrant was issued? Which I kind of doubt. No, it took two hours. Then they kept him in front of the trailer for two hours? No. I don't know that part. But what I'm saying is the taking of the keys, if it occurred, if you credit the defendant, the taking of the keys has nothing to do, it doesn't bear against or weigh against the voluntariness of the limited consent to search because it occurs at a different time. See, I thought that happened before the limited search. No. It didn't. Okay. I do not think that the record shows that. No, we'll look at the record, see whatever the record says. From what I can tell, the defendant, even crediting the defendant's testimony, that occurred after he had refused general consent to search, the taking of the keys. And so that is subsequent to the voluntary consent for a limited search. So in any event, the taking of the keys does not, it is an irrelevant factor to whether the defendant gave limited consent voluntarily because the taking of the keys, even crediting the defendant's testimony, the taking of the keys occurred later. And so it's not a factor in whether the limited consent was given voluntarily. Thank you. Thank you, Ms. McCormick. We'll have the opportunity for a rebuttal. Ms. Colburn, speak. Your Honor, it's over. May it please the Court. Your Honor, I'd like to go start with the facts of the case. On July 5th of 2008, my client bought a package of pseudoephedrine, I believe from the same drugstore that he did on July 24th, 2008, which is when this incident occurred. He was in his trailer. It was not a big home. It was, I believe, a two-veteran trailer in Collinsville, Illinois. His brother was outside the residence, lived with him, was outside when the police arrived. There were three officers that arrived, an Agent Fisher, Special Agent Patterson, and an Agent Hofstad. They came to the house, asked his brother if he was home, and said, get him outside. So Donald hollered in for his brother, who came outside. At that point, that's all that had happened. There were three officers there and the two men, the two brothers. He asked, he arrested the defendant, did not tell the defendant why he was arrested. It was for an outstanding traffic warrant that he failed to appear in the Collinsville Municipal Court for a traffic violation, nothing related to meth abandonment production or abuse. He did have a conviction in the past for meth use at that point in time. This is in 2008. I believe that was 2006, possibly, but I want you to quote me on that. He comes outside, and the officer, Agent Fisher, asks him, did you buy the pills today? He said, yes. He said, where are they? He said, in my medicine cabinet. Now, because of the smallness of the trailer, the medicine cabinet is apparently in the kitchen. He asked if he could go in and get them, and my client said no. His brother was standing there, also testified in the suppression hearing that his brother said no. Agent Fisher apparently walked in, and my client hollered at his brother, go in after him, and that's where the dispute, in fact, the big first dispute is. So Ms. McCormick says, though, from what I understand of her argument, is that you can't really have that dispute work with what the judge found about the credibility of the officers. So explain that to me. Okay, yes. So they still work together, that if it was really not voluntary, this limited search, then the court could not have found the officers to be credible? The court stated that the court find the first order before the remand. Judge Hackett stated that at the time of questioning, the defendant was in custody, he was entitled to Miranda, et cetera. He stated that, and I will quote his order, case law has sometimes made a difficult path for police to follow as to questioning suspects after ticketing, detention, or arrests. These are somewhat complex circumstances here, which could be trying for the officers no matter how good their intentions. However, the rules are clear. Arrested defendants must be warned defendants for valid questions to follow. The questions concerning the location, okay, excuse me, prior to that the judge stated he didn't fault the officers because this would be in the record, the oral record, versus in the written order. The judge stated he doesn't fault the officers because the rules have been changed so many times regarding arrests of defendants, questioning Miranda warnings, and all of that, that they could be confused basically with what's going on. He didn't think that the officers came with the malicious intent to circumvent all constitutional rights. The officers went there after receiving the call of the purchase of pseudoephedrine. Agent Fisher knew the defendant from the previous arrest for the manufacturing, went to the house, and did this. So is it your position that the court could both believe that the officers were credible and that the defendant was credible in saying, I never gave them permission for the limited incentive search? Yes. The way that the record reads, which you have a copy of the record, the way that the transcript reads is, and again, this is my view of that, is that I'm not faulting you because everything's been micromanaged and analyzed and changed for what happened here, but an arrested defendant must be a warned defendant. You violated his constitutional rights. I'm not saying you did that with the intention to do that. There are cases, I'm sure, out there where the officers have every intention to violate the individual's constitutional rights. That's not the case here. The case here is that they went there to do the search. He didn't give consent. They're saying he did. The defendant's brother, as I indicated before, stated in the hearing that his brother did not give him consent to search. And I'll back up just a bit here. When the officer came out with the pseudoephedrine box and the defendant's brother came out after him, the defendant asked his brother, told his brother, lock the door. So that's how the door was locked. It was after he had gone in the first time, according to the defendant and his brother, without consent. At some point during this first time in the house and coming out and the door being locked, defendant's son was brought to the house in a police car. He had been stopped a few streets over because the car was registered to my client and they thought that was the defendant. The Collinsville cops thought that was the defendant. Sorry, it's confusing. They brought the defendant's son back to the house. So my client is handcuffed by the police car in his yard. The defendant's brother is somewhere in the yard. At this point there's about four officers because the master sergeant, Warren, came to the house, who is apparently another expert in meth manufacturing. Then the other officers came with the defendant's son. The defendant's son is ordered to stay in the back of the police car, according to his testimony. He never heard his dad give permission to go inside. He heard or saw Agent Fisher grab the keys from the belt of my client and then go back in the house. At some point during this time period, after Agent Fisher and his brother came out of the trailer, and two hours later a warrant was obtained and they went inside. The only other things they found besides the hydrogen peroxide and the alcohol was a Coleman heater or a cooker thing that campers use and meth manufacturers use. Coleman, the fuel? They found the fuel. They did not find the fuel. It was the Coleman. A Coleman camp stove. Yes, I'm sorry. Thank you. The camp stove and a muric acid container. There was also noted a burn pile in the backyard. It was tested. There was no meth residue whatsoever in the burn pile. So the items that were seized were items that, quite frankly, we have in our house. My husband likes to camp. I don't. I don't know what they are, but he uses them. Be careful. We want to warn you. Well, prior to this case arguing it twice in a previous case where our client bought matches at Sam's, I wouldn't have thought anything of it. But I have hydrogen peroxide. I have all these ingredients in my home. Does that mean that I am going to, if I buy a suit of Vedran, that the cops will come and search my home because I bought that? I think the judge was basically, what his order is, is that an arrested defendant, whether the officer said he didn't give him Miranda because he was being arrested for an outstanding warrant, he didn't know yet that there were going to be charges filed. When he came out of the house, the only thing he had was the same thing that he knew was in there when he got to the house, if that makes sense. He didn't have any other information. If he didn't know when he got to the house that he was going to arrest the defendant or look into him for meth manufacturing and other items in his house, he didn't know that when he left the house and then went back in again without consent to do that. The items that were in the house are in most people's homes. Can you tell me then, did the police officer testify that he saw anything else when he was in there looking? Only the hydrogen peroxide and the alcohol. That's all he saw when he went in on the limited search. That's all he said he saw. You mean the first search? Yes, the first search. We know 10 members of the office. I'm just calling it the limited search. State calls it the limited search, yes. So that's all that he observed. Yes, yes. And they didn't know anything about the other, the only thing that got them there to begin with was the one packet. The packet from, yeah. From Wal-Mart or whatever it was called. It was a small pharmacy in Collinsville. Oh, and it wasn't Wal-Mart. No, it was not Wal-Mart, and I don't believe it was. But it was one of those tip-offs that. It may have been Walgreens. Walgreens, now we're at Walgreens. But somebody called, or did they observe him buying it? My understanding is the person, the pharmacist, the tech that sold the pseudoephedrine called the police then. Okay. So he must have been on some kind of list. He has one conviction. Yeah, he has one conviction for. That's why they were so interested in the one purchase. Correct. He's on a list. Now, whether you can have, and it may be because he also purchased it on July 5th, 19 days before that, I don't know how often or what the actual procedure or protocol is now with Walgreens calling police officers when someone purchases. Well, let me ask the question I asked before, or maybe I didn't. How long is a box, if you have a cold, supposed to last? Well, it depends on the box. Now, I haven't looked into this because of this case, and you can buy them in several different quantities. There is nothing, strangely, in the record of how many were in that. Okay, that's the question. It can be a week's worth up to 14. I don't think there is a 30-day supply because of all of this, the meth manufacturing, because that would give someone a number. So it was 19 days before, or how many days before? It was July 5th, and he was arrested on July 24th, so 19 days before that, that he purchased it. The outstanding warrant, like I said, was for a traffic violation. The case law that both counsel and I have cited are fairly clear and distinguishable from this case where there is either more information. Redman is a case that was cited. That the officer smelled a stranger coming from the house as he drove by. There was a walkway that was public that he saw items in an open garbage can. The defendant gave written consent to search, quite different than here. Even if you believe the officers and do not believe the defendants at all, there was no written consent. There was no Miranda warnings. There was no smell. And even after the fact, there was nothing that could give you from the outside any indication that there was meth manufacturing. Even the burn pile in the garbage didn't have anything. That would be in the later case maybe. Yes. So, right. The other cases that, for instance, the cases regarding search, the items that were found by the search warrant, the agents indicated they carefully followed the scope of his consent. In the case of three, that the city site, that the officers were allowed in the home by the defendant. They were legally in the home and some of the items were in plain view. Again, factually distinguishable from this case where the defendant was walked outside and arrested for something else. Is it important that he claimed that he had no idea where he was arrested? Yes. And I was just getting to that. Thank you. It is important because had he, again, assuming or inferring, if he is manufacturing meth or going to and knows that he's being questioned for that at that point, he might not have made any responses. They did not tell him why he was arrested. I can only assume that he knew he had an outstanding warrant, most people do, for a traffic violation. The officers are here. They arrest him. He didn't think he was doing anything wrong by purchasing one box 19 days later and tells them the truth. That is where it is distinguishable as far as or where it's important that he was not arrested for on suspicion of meth manufacturing. Now, the other item to go with or the other argument to go with that is that none of the other items in meth manufacturing were found in the home that could get the whole process started at that point. Now, granted, in the defendant's argument, they can state that he was assembling everything to do this at a later date. But without any of the red phosphorous match type of manufacturing or with this type, the officer didn't find any milk bottles or any coffee filters. Nothing was found in that sense, no. If there are no other questions, that's all I have. Thank you. Your Honor, if the court below had credited the defendant, we wouldn't be here now. I'm sorry. If the court below had credited the defendant, we wouldn't be here. Credited his testimony? Yes, exactly. If the court below had credited the defendant's testimony, we wouldn't be here. The defendant said, I didn't give consent, limited or otherwise, no consent ever. It would have been an illegal search. The first search would have been illegal if the court had credited the defendant. The court did not credit the defendant. Does it say in the order that it did not credit his testimony? The court below said, I don't find fault with the officers. No, but that doesn't answer my question. Yeah, okay. Well, does it specifically say? I wish that courts below would be very specific, but they're not. And so we're piecing it together. And the reason I'm piecing it together this way is because the court said, I don't find any fault with the officers, no significant lack of diligence or professional performance or any artifice or any thought of artifice in this. Okay. If the court had credited the defendant, the order wouldn't have been this way. The order wouldn't have been considering whether there was a Miranda violation because the court would have quashed the search warrant and would have found that the search itself was illegal, limited or not. The court didn't find that. And so this is why I'm saying we're piecing it together, that the court credited the officers because of the way, the direction the order took. The order addressed Miranda and voluntariness. It didn't address whether there was no consent. Could we consider the whole arrest as potential? No. It was an arrest on a search warrant. Well, I'm aware of that. I mean, an arrest on a warrant. I'm aware that there was a warrant that would make it a valid arrest. However, it just seems very unusual that you would go to somebody's house just because someone purchased one box of pseudofedrin. I mean, we'd better all be afraid. If that's all it takes is purchasing one box of pseudofedrin. It's not just one purchase. If you look at the complaint for this search warrant, the affidavit states that the defendant purchased pseudofedrin on June 15th, July 5th, and then we also know that he purchased it on July 25th. So we have three purchases. The officer's interest in this particular defendant began that day because of a report from a Walgreens employee that he'd come in and purchased pseudofed again. Then, before they went, they found out that the defendant was wanted on a warrant for failure to appear. And what was that on, you know? Was that for speeding or something like that? I don't know what the underlying crisis was. But it was an ordinance violation, not a state charge that he was wanted on? Your Honor, I'm sorry. I don't know. All I know is that he said, the defendant said, that it was for a battery. And that's what the defendant said, that they told him that they were arresting him for a battery or in an arson, I believe it was. But the officer said, no, it was a failure to appear warrant. So a copy of the warrant is not in the record? I don't believe so. But the failure to appear, I don't know what it was.  But, yes, the officers had in mind to investigate the meth, any possibility of a meth crime.  That was their sole purpose. Wasn't that their sole purpose? They didn't rush over there to arrest him on an outstanding warrant. Or do you think that's probably what happened? No, I think that the investigation preceded the finding out that he had the warrant. That's what the record shows. So, yes, they were investigating a meth violation. And so for that reason, like I said in the beginning, for that reason, the circumstances of this particular case show that when they ask him, did you buy the Sudafed and where is it, because of what they knew about this particular crime, it does call into play Miranda. And that's why I'm saying, yes. And it's not contested that the statements that he made would be suppressed by under Miranda because it was custodial interrogation regarding an ongoing meth investigation. And he was the suspect. But otherwise, I guess it's up to you. Thank you, Mr. Foreman. We will take the matter under revised.